# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO MOLINA,<br><br>             Plaintiff,<br><br>        v.<br><br>K. HOLLAND, et al.,<br><br>             Defendants. | Case No. 1:15-cv-01260-DAD-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED BASED ON DISPUTES OF FACT, THAT PLAINTIFF BE DEEMED TO HAVE EXHAUSTED HIS AVAILABLE ADMINISTRATIVE REMEDIES AS TO ALL CLAIMS, AND THAT PLAINTIFF'S MOTION FOR EXPERT WITNESS BE DENIED AS MOOT<br><br>(ECF NOS. 37 & 71)<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

## I.    BACKGROUND

Mario Molina ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action now proceeds on Plaintiff's First Amended Complaint (ECF No. 30),[1] on Plaintiff's "claims against defendant Rivera for excessive use of force in violation of the Eighth Amendment, against defendants Rivera and Stanley for deliberate indifference to serious medical needs in violation of the Eighth Amendment, and against defendants Rivera, Stanley, Holland, Gutierrez, and Jones for

---

[1] Plaintiff's First Amended Complaint is listed on the Docket as Plaintiff's Second Amended Prisoner Civil Rights Complaint.

1

retaliation in violation of the First Amendment." (ECF No. 74, pgs. 2-3). Those claims stem from Plaintiff's allegation that Defendant Rivera sprayed him with pepper spray "point-blank" on his face and then refused to let him decontaminate, resulting in severe and permanent injury to the eye. When Plaintiff complained about what happened to prison officials, he was placed into Administrative Segregation for fourteen months without any charges or rules violation reports.

On April 27, 2017, Defendants filed a motion for summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies before filing this action. (ECF No. 37). On May 15, 2017, Plaintiff filed his opposition to the motion. (ECF No. 41). On May 22, 2017, Defendants filed a reply and evidentiary objections to Plaintiff's evidence (ECF Nos. 43 & 44).

After reviewing the evidence, the Court determined that there was a dispute of material fact, and that an <u>Albino</u> evidentiary hearing was necessary. (ECF No. 48). The Court conducted the evidentiary hearing on September 29, 2017.

For the reasons described below, the Court recommends denying Defendants' motion for summary judgment and that Plaintiff be deemed to have exhausted his available administrative remedies as to all claims. The Court also recommends denying Plaintiff's motion for expert witness without prejudice.

## II.    LEGAL STANDARDS

### A.    <u>Exhaustion</u>

"The California prison grievance system has three levels of review; an inmate exhausts administrative remedies by obtaining a decision at each level." <u>Reyes v. Smith</u>, 810 F.3d 654, 657 (9th Cir. 2016) (citing Cal. Code Regs. tit. 15, § 3084.1(b) (2011) & <u>Harvey v. Jordan</u>, 605 F.3d 681, 683 (9th Cir. 2010)). <u>See also</u> Cal. Code Regs. tit. 15, § 3084.7(d)(3) ("The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent. The third level of review exhausts administrative remedies….").

Section 1997e(a) of the Prison Litigation Reform Act of 1995 (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002) (per curiam). The exhaustion requirement applies to all prisoner suits relating to prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, unless "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." Booth v. Churner, 532 U.S. 731, 736, 741 (2001); Ross v. Blake, 136 S.Ct. 1850, 1857, 1859 (2016). "Under the PLRA, a grievance 'suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010) (quoting Griffin, 557 F.3d at 1120).

As discussed in Ross, 136 S.Ct. at 1862, there are no "special circumstances" exceptions to the exhaustion requirement. The one significant qualifier is that "the remedies must indeed be 'available' to the prisoner." Id. at 1856. The Ross Court described this qualification as follows:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819. . . .
>
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . .
>
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. . . . As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar.

Id. at 1859–60.

"When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." Andres v. Marshall, 867 F.3d 1076, 1079 (9th Cir. 2017).

If the Court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by section 1997e(a). Jones, 549 U.S. at 223–24; Lira v. Herrera, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

**B.** **Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded fact-finder could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

4

facts immaterial." Celotex, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are not enough to rebut a summary judgment motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), citing Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record… from which a reasonable inference… may be drawn"; the court need not entertain inferences that are unsupported by fact. Celotex, 477 U.S. at 330 n. 2 (quoting In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 258 (1983)).

In a summary judgment motion for failure to exhaust, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino II, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. However, "the ultimate burden of proof remains with the defendant." Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166.

While parties may be expected to simply reiterate their positions as stated in their briefs, one of the purposes of an evidentiary hearing is to "enable [ ] the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice….'" United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995). All of this assists the finder of fact in evaluating the witness' credibility. Id. It is only in "rare instances" that "credibility may be determined without an evidentiary hearing…." Earp v. Ornoski, 431

F.3d 1158, 1169–70 (9th Cir. 2005).

## III.    PLAINTIFF'S COMPLAINT

### A.    Summary of Relevant Portions of First Amended Complaint (ECF No. 30)

The incidents alleged in the complaint occurred at California Correctional Institution Tehachapi ("CCI Tehachapi").

Plaintiff alleges that on December 14, 2013, Plaintiff was involved in a fight with another prisoner. Plaintiff characterizes it as "a minor mutual combat fight," which lasted less than a minute. There were no weapons involved, and no serious injuries occurred. The staff responded quickly and restored order. When the staff ordered Plaintiff and the other prisoner to stop, they did. Plaintiff and the other prisoner lay down with their hands behind their back. Despite this, the staff sprayed Oleoresin Capsicum ("O.C.") on both Plaintiff and the other prisoner.

Plaintiff and his opponent were handcuffed, searched, and secured. At that point, they did not pose a threat. While Plaintiff was handcuffed and lying down, Defendant Rivera approached Plaintiff from behind, grabbed Plaintiff's upper-torso, and "point-blank" sprayed O.C. on Plaintiff's face, injuring Plaintiff's right eye and leaving his left eye with limited vision. The pressure from the canister was so great that it punctured the cornea in Plaintiff's right eye. The spay-can was approximately four inches from Plaintiff's face when Defendant Rivera sprayed Plaintiff with the O.C. Defendant Rivera then kicked Plaintiff in the rib cage.

After the incident, Plaintiff was escorted to the program office and placed in a holding cage without water or a toilet. Plaintiff lacked water for decontamination. While in the holding cage, Plaintiff requested a chance to wash the O.C. off his face. Defendant Rivera laughed and stated in Spanish "as long as you are not dead, everything is good."

While Plaintiff was having this discussion from the holding cell, Defendant Stanley asked what Plaintiff wanted. Defendant Rivera responded that Plaintiff wanted to wash the O.C. off his face. Defendant Stanley laughed and stated "No! Take that as a lesson, not to fuck with my program. Now, you have to wait, until you get back to your house." Defendant Stanley and Defendant Rivera then walked away and left Plaintiff in a holding cell without an

opportunity to decontaminate from about 6:35 a.m. until 9:20 a.m. Plaintiff requested medical attention from Stewart, a Registered Nurse. Plaintiff also asked for help to have the O.C. washed out of his eyes. Stewart relayed the request to Defendant Stanley, but Defendant Stanley refused the requested relief.

Plaintiff later learned that the pressure of the O.C. had punctured Plaintiff's cornea and the O.C. had entered Plaintiff's eye-ball behind the cornea, burning Plaintiff's nerves and muscles inside his eye.

Plaintiff eventually returned to his cell and washed off the O.C. Throughout the day, Plaintiff tried to get the attention of the staff on the control floor, as well as the staff on the floor of the building, pleading for medical attention and informing them that there was something wrong inside his eye. The staff informed him to put in a medical request, which he did, with no results.

From December 14, 2013, through mid-January 2014, Plaintiff was denied adequate medical attention, despite numerous attempts to obtain the appropriate medical attention. It took approximately one to one and half months to obtain medical attention from an eye doctor. The doctor determined that Plaintiff's right eye had been lacerated/punctured. As a result, Plaintiff had no vision in his right eye. The doctor also determined that Plaintiff's left eye had partial vision, with no cornea damage. The doctor recommended cornea transplant surgery.

Plaintiff filed his first administrative appeal on January 6, 2014. However, the appeal was "lost" and not logged. On one occasion, Defendant Rivera told Plaintiff in no uncertain terms that Plaintiff should not pursue any complaint against him. On another occasion, Defendant Stanley called Plaintiff to the program office and told Plaintiff that if he pursued any complaints against him or his staff, Plaintiff would be sorry. Plaintiff was surrounded by several guards and feared for his safety. However, Plaintiff refused to stop pursuing the filing of his appeal.

Plaintiff later filed a complaint against Defendant Rivera and mentioned the other defendants, which required a videotaped interview that was submitted to the Internal Affairs Group. Prior to the interview, Defendants Rivera and Stanley, as well as other unidentified

guards, repeatedly cajoled and threatened Plaintiff to deter him from conducting the interview.

The interview was conducted on July 28, 2014. Plaintiff reiterated the allegations against Defendants Rivera and Stanley. Plaintiff also indicated that he had been constantly harassed and had received threats from Defendants Rivera and Stanley and from unknown guards. In response, Plaintiff was placed in Administrative Segregation for fourteen months. This term was approved by a Lieutenant, a Captain and a Sergeant, as well as Defendants Kim Holland and J. Gutierrez. Plaintiff was purportedly placed there "pending an investigation." However, Plaintiff had committed no rules violations and was no threat to the safety of the institution. The reason for his placement in Administrative Segregation was as a reprisal and to silence Plaintiff. In the end, no investigation was conducted.

While in Administrative Segregation, Plaintiff was "red lined," which means that staff were not to do anything for him. Plaintiff was denied access to his personal property. Plaintiff's mail was routinely thrown away. Plaintiff's legal mail was often open and read by prison staff. It was also withheld so that Plaintiff could not meet time limitations in responding to any adverse ruling or attempt to exhaust available administrative remedies. Plaintiff was repeatedly told that all of this would stop if he just withdrew the staff complaint against defendants and admitted that his interview statements were false. Defendant Rivera in particular harassed and threatened Plaintiff.

Defendants Kim Holland, J. Gutierrez, and Captain Jones consistently attempted to shield the prison and its staff from liability by asking Plaintiff to drop the staff complaint in exchange for release from Administrative Segregation. They repeatedly told Plaintiff that if Plaintiff abandoned the complaint, Plaintiff would come off the "shit list."

On April 14, 2014, five months after the O.C. incident, Plaintiff received the first cornea transplant surgery. The surgery was a failure. The eye doctor who conducted the surgery concluded that prison medical staff had failed to give Plaintiff the necessary anti-rejection medication to help Plaintiff's eye accept the new cornea.

Plaintiff underwent another cornea transplant surgery on July 24, 2014, which was a failure. Plaintiff received another transplant on February 3, 2015, which failed, and another on

8

July 9, 2015, which failed. Every time, Plaintiff's body rejected the cornea. Plaintiff received more than six cornea transplants, but none were successful. Plaintiff's sight in his right eye has been permanently impaired.

B.     Cognizable Claims

Plaintiff's First Amended Complaint was screened (ECF Nos. 28, 73, & 74), and this action now proceeds on Plaintiff's "claims against defendant Rivera for excessive use of force in violation of the Eighth Amendment, against defendants Rivera and Stanley for deliberate indifference to serious medical needs in violation of the Eighth Amendment, and against defendants Rivera, Stanley, Holland, Gutierrez, and Jones for retaliation in violation of the First Amendment." (ECF No. 74, pgs. 2-3).

IV.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.     Parties' Positions as Presented in Motion for Summary Judgment Papers

In their motion for summary judgment, Defendants argue that Plaintiff failed to exhaust his administrative remedies as to all of his claims in this case. (ECF No. 37, p. 3). Defendants submitted evidence that Plaintiff submitted grievances related to the pepper spray incident and lack of decontamination (log nos. CCI-0-15-00404 and CCI-0-15-00406), but that these grievances were canceled because Plaintiff failed to meet the time constraints in submitting them. (ECF No. 37, p. 5). While there was a third appeal (log no. CCI-0-15-01718) that mentioned Administrative Segregation placement and transfers, and that discussed staff misconduct on December 14, 2013, the third appeal was rejected because the appeal contained multiple issues that were not related. (ECF No. 37, p. 5). Plaintiff was advised that he could resubmit each issue separately. (Id.). Plaintiff resubmitted the appeal, but it was rejected because Plaintiff did not attach all necessary supporting documentation, as required by California Code of Regulations, title 15 § 3084.3(a). (Id.). Plaintiff was told to attach the supporting documents and resubmit the appeal, but there is no record that he ever did. (ECF No. 37, p. 5).

Plaintiff submitted evidence that he filed a grievance on January 6, 2014. (ECF No. 41, pgs. 12-13 & 34). The grievance related to the pepper spray incident and subsequent refusal to

allow Plaintiff to decontaminate that occurred on December 14, 2013. (ECF No. 41, pgs. 2 & 12-13). Plaintiff never received a response. (Id. at 34). Plaintiff submitted evidence that on June 11, 2014, he inquired about the status of his grievance, but was told that his grievance was not in the system. (Id. at 15 & 34). Plaintiff alleges that he was told not to pursue grievances, and was threatened. (Id. at 3 & 35).

As to the grievance with log no. CCI-0-15-00161, which was related to Plaintiff's allegations that he should not have been in Administrative Segregation (ECF No. 37-1, p. 3, ¶ 11), Plaintiff alleges that he submitted the documentation that he was told to submit, but the grievance was erroneously canceled. (ECF No. 41, pgs. 34 & 35).

### B. Recommendation Regarding Summary Judgment

The parties' positions in the summary judgment motion largely turn on a factual dispute. Defendants claim (and submitted evidence) that Plaintiff did not properly submit grievances related to the incidents alleged in the complaint, while Plaintiff claims (and submitted evidence) that he properly filed grievances, but that they were not processed.

Because Defendants' motion for summary judgment cannot be determined based on undisputed facts, the Court recommends that it be denied so that the defense of exhaustion of administrative remedies may be decided with the benefit of the evidence presented at the evidentiary hearing.

## V. SUMMARY OF EVIDENCE PRESENTED AT EVIDENTIARY HEARING

As the Court determined that there was a dispute of material fact (ECF No. 48), the Court conducted an Albino evidentiary hearing on September 29, 2017. Plaintiff appeared on his own behalf. Counsel Cassandra Shryock and Marisa Kirschenbauer appeared on behalf of Defendants. Gregoria Lara and Rebecca Rubenstein interpreted.

Plaintiff called Peter Mercado and Michael Hernandez as witnesses, and testified on his own behalf. Defendants called Plaintiff, J. Wood, J. Barba, and K. Cannon as witnesses.

As evidence, Defendants submitted the grievance Plaintiff allegedly submitted in January of 2014 (Defendants' Exhibit 1), several Form 22s (Defendants' Exhibits 2, 9, & 11), Plaintiff's motion for witnesses (Defendants' Exhibit 3), several grievances submitted by

10

Plaintiff (Defendants' Exhibits 5, 6, 7, & 8), Plaintiff's Inmate and Parolee Appeals Tracking System ("IATS") appeal history (Defendants' Exhibit 10), screen-out notices for the grievance with log no. CCI-0-15-00161 (Defendants' Exhibit 12), the Bed Assignments Report for Plaintiff (Defendants' Exhibit 13), Plaintiff's Second Amended Complaint (Defendants' Exhibit 14), the declaration Plaintiff submitted with his opposition to Defendants' motion for summary judgment (Defendants' Exhibit 15), and the transcript of a video interview of Plaintiff (Defendants' Exhibit 19).[2]  Additionally, all evidence Defendants submitted with their motion for summary judgment (ECF No. 37) was admitted into evidence.  Transcript of Proceedings before Magistrate Judge Erica P. Grosjean, September 29, 2017 ("Tr.") at 63:7-18; 67:16-25.

As evidence, Plaintiff submitted a copy of the grievance he allegedly filed related to the pepper spray incident and subsequent refusal to allow him to decontaminate that occurred on December 14, 2013.  Plaintiff's Exhibit A.  He also submitted medical progress notes (Plaintiff's Exhibit B), a letter from the Los Angeles Superior Court to Plaintiff (Exhibit C), several California Department of Corrections and Rehabilitation ("CDCR") Form 22s (Plaintiff's Exhibits D, G, H, and I), a CDCR Form 114-D (Plaintiff's Exhibit E), and a CDCR Form 128G (Plaintiff's Exhibit F).  All of Plaintiff's exhibits were admitted into evidence.  Tr. at 91:3-98:3.  Additionally, all evidence Plaintiff submitted in his opposition to the motion for summary judgment (ECF No. 41) was admitted into evidence.  Tr. at 63:7-18; 67:17-25.

A.  Summary of Evidence Presented at Evidentiary Hearing

i.  Plaintiff's Testimony

Plaintiff testified that the incident involving Defendants Rivera and Stanley happened on December 14, 2013.  Tr. at 20:22-25.

After the incident, Plaintiff asked other inmates who could assist him with completing a grievance,[3] and was told that another inmate named Peter Mercado knew how to do so.  Id. at 22:14-20.  About a week after the incident, Plaintiff approached Mr. Mercado about having Mr. Mercado assist Plaintiff with completing a grievance.  Id. at 22:24-25.  Plaintiff needed Mr.

---

[2] Defendants also submitted a copy of the video interview (see ECF No. 67).
[3] Also referred to as a "602," or an "appeal."

11

Mercado's assistance in completing the grievance because at the time Plaintiff was almost blind, because Plaintiff does not read or write English, and because Plaintiff had never filled out a grievance form before. Id. at 21:24-22:12.[4]

About a week after Plaintiff approached Mr. Mercado, Mr. Mercado presented Plaintiff with the grievance. Id. at 24:7-8. Mr. Mercado wrote the grievance on Plaintiff's behalf. Id. at 23:18-25. Mr. Mercado read what he had written to Plaintiff, and Plaintiff agreed with everything he said. Id. at 24:9-12.

What Plaintiff describes is a copy of his grievance that was admitted as Defendants' Exhibit 1. Tr. at 29:16-20. It is dated "1-6-14" in two places indicating the date. It states:

> CITIZEN COMPLAINT AGAINST C/O RIVERA AND SGT JOHN DOE. (Cf. Pen. Code, § 832.5). MALICIOUSLY, WILLFULLY, KNOWINGLY INJURING MY RIGHT EYE WITH THE SPRAY…. On 12/14/13 I was involved in a mutual combat. Once I was down by the orders of the C/o. C/o Rivera placed his full body with his knee on my back and handcuffed me. Once handcuffed on the floor, C/o R knowingly, maliciously, with intention to cause harm, lifted my face and sprayed me at close range, injuring my right eye and, then proceeded to kick me with boot on my rib-cage. Minutes later I was escorted by C/o R to a cage inside the Program Office. I requested C/o R to give me a chance to wash the spray out off [sic] my face, because it was burning my eyes; C/o R laughed at my suffering and stated: "As long as you are not dead, everything is good." Since C/o R and I were speaking in Spanish, the Sgt John Doe (JD), asked C/o R, what I wanted; C/o R stated that I wanted to wash the spray off my face. Sgt JD laughed and stated: "No! Take that as a lesson, not to fuck with my program. Now, you have to wait until, you get back to your house." I requested the RN (John Doe) help and Sgt JD again denied the request, with a "No!" I was inside the cage from 6:35 A.M. to 9:20 A.M with the spray on my face. Due to C/o Rivera's malicious misconduct, I started to lose sight of my right eye and is always watering and painful. Moreover, I am suffering pain in my ribs when I breath. This is an (ongoing) matter as the health problem has slowly progress [sic] and, to protect my rights in a future judicial proceeding, this appeal (Citizen Complaint) is been file against C/o R and Sgt JD.

(Defendants' Exhibit 1).

The grievance lists the cell number as "C3-241." However, Plaintiff testified that he thought he was in cell number 244 or 243 at the time. Tr. at 23:13-17.

---

[4] Plaintiff also testified that he needs help writing everything. Tr. at 39:23-24.

Plaintiff did not sign the grievance that day, but instead waited until he could go to the library to make a copy. Id. at 24:13-21. He went to the library to make a copy "towards the end of December." Id. at 24:15-21. Plaintiff did not submit the grievance immediately after making a copy because he still could not see and his cellmate only spoke English. Id. at 24:22-25:7. Plaintiff's neighbor, Mike, told him he should submit the grievance and helped him turn it in. Id. at 25:13-19; 28:6-9. The grievance was submitted two or three days after January 6, 2014. Id. at 30:7-15. The Court notes that this date would have been within the thirty-day time period to file a grievance.

Plaintiff testified that he submitted the grievance by placing it into an institutional envelope and handing it to an officer to be sent through institutional mail. Id. at 31:1-25. Plaintiff thought he handed the envelope to Office Stewart, but he was not sure if that was the officer's name. Id. at 33:13-16.

Plaintiff testified that the prison never responded to his 602 appeal. Id. at 46:5-9 ("There was never, there was never a response.").

Plaintiff testified that, since he had not received a response to his grievance, at the end of February he began inquiring about the status of his grievance. Id. at 38:10-22. Plaintiff asked a yard sergeant why he had not received a response to his grievance, and an officer standing next to the yard sergeant responded that "I was lucky that my other eye was still fine and that I should quit my crying." Id. at 38:25-39:4.

Defense counsel noted during Plaintiff's testimony that Plaintiff's Second Amended Complaint stated that Plaintiff started inquiring into the status of his appeal in early March 2014. Id. at 39:9-22. Plaintiff responded during the hearing that "Like I told you, people help me to write out everything that I have. At that moment when they're helping me write it out I might recall a date or a near date. What I recall at that moment is what those people that are helping me write this out, that's what they write…. And if you notice, every other paperwork that I've ever turned into the Court you might notice different handwriting and sometimes they are typed out, sometimes by hand. Because like I said, I have to take advantage of the time when I have the person helping me out. And that's, perhaps, one of the reasons why we

haven't written out everything exactly the same because it's not always the same person who helps me out." Id. at 39:20-40:10.

On June 11, 2014, Plaintiff submitted a CDCR Form 22 to the Appeals Office asking about the status of his 602. Id. at 46:12-19. That document states "I submitted a 602 appeal (citizen complaint) against C/o Rivera. However until the above date I have not received a receipt of the notice of appeal. Therefore I would like to know if the appeal has bee [sic] processed. Thank you." Defendants' Exhibit 2. The Form 22 indicates that it was returned to Plaintiff on June 12, 2014 with the notation "There are no such appeals for you, according to our system at this time." Id.

Plaintiff's version of this document includes a blacked out area with the date "1-6-2014" written above it in the sentence that begins "On or about?" There was substantial discussion about this blacked out area. Plaintiff originally testified that his copy was the same as had been submitted to the Appeals Office. Tr. at 74:1-8. But when asked by the Court, Plaintiff stated that in fact the blacked out area had not been submitted originally. Rather, it originally had the date listed as 2013, and Plaintiff himself changed it when he submitted it to the Court to reflect the true date of 1/6/2014. Id. at 75:3-76:16. Defendants then admitted another copy of the same Form 22, which included a blacked out area and the date "1-6-2013" above it. Defendants' Exhibit 9. Plaintiff stated that he changed the year because he made a mistake. Tr. at 78:11-19. (As described more fully below, the copy of this document that was received by the prison shows that under the black-out was the date 5/4/14).

In July of 2014, Plaintiff wrote a letter to a judge complaining about Defendant Rivera. Id. at 45:1-9. The Judge's response was admitted as Plaintiff's Exhibit C and states "I received your letter dated July 6, 2014. The court takes allegations of prisoner abuse and official misconduct very seriously." The Judge then describes how he forwarded it to others for appropriate review. Plaintiff's Exhibit C.

Plaintiff also testified that Defendant Stanley "said for me to quit my crying" at some time before July 2014. Tr. at 45:10-24. Plaintiff testified "I was afraid at that time, yes. That, that's why I wrote the letter to the judge presiding my criminal case to tell them about my

situation." <u>Id.</u> at 46:1-4.

Plaintiff was interviewed by the prison in July of 2014. He testified that it was about "a little of everything of what had been happening to me in the yard and about the 602." <u>Id.</u> at 47:22-48:7. Defendants submitted a certified transcript of the video (Defendants' Exhibit 19), along with their copy of the video. According to the transcript, prison officials asked Plaintiff about the original assault allegations. Relevant to the question of exhaustion before this Court, Plaintiff stated during the interview in July 2014 that "he filed a 602 about his eye, and the 602 got lost and nobody knows where it's at." Defendants' Exhibit 19, at 5:18-21. He also stated during the July 2014 interview that "He's afraid of retaliation, not necessarily of losing his life, but retaliation from one who submitted the paperwork or submitted the letter…. He says that since (inaudible) got lost, he thought there would be retaliation, so that's why he sent the letter." <u>Id.</u> at 8:3-14.

Following the interview, Plaintiff was put in Administrative Segregation on July 28, 2014, and remained there until September 2015. Tr. at 44:12-18. The prison's reason for putting Plaintiff in Administrative Segregation was that "On July 28, 2014, while housed at California Correctional Institution Facility 'C,' [Plaintiff] informed staff during a videotaped interview that [he had] self-proclaimed safety concerns with staff…. Based on this [Plaintiff was] deemed a threat to the safety of others and the security of the institution." Plaintiff's Exhibit E.

Plaintiff testified that some time after he was in Administrative Segregation "a different officer—I don't know his name because he only came to interview me once—that if I quit my 602 they would return me back to the yard." Tr. at 43:7-14. Additionally, at the beginning of 2015 or the end of 2014, Defendant Rivera told him not to pursue complaints against him. <u>Id.</u> at 44:2-25. However, Plaintiff testified that he was not deterred and was going to keep complaining against him. <u>Id.</u> at 44:21-25.

Plaintiff testified that while in Administrative Segregation, he submitted three different grievances complaining about his placement in Administrative Segregation "because I felt it was unjust for me to be in the hole and no investigation was being done." <u>Id.</u> at 48:11-22.

Defendants admitted three screen-out letters from the Appeals Office. Defendants' Exhibit 12. One, dated January 20, 2015, states that "[y]our appeal is missing necessary supporting documents" specifically, a copy of CDCR 128. The letter stated that "[i]f you are unable to obtain a response, submit proof of your attempt(s) to obtain the response." Defendants' Exhibit 12, p. 1. On February 20, 2015, the Appeals Office screened out Plaintiff's grievance because "[y]ou have written in Section 'D' of your Form 602, this area is reserved for an explanation as to why you are dissatisfied with the First Level Response…. Re-write your Form 602 making sure that you only use Sections 'A' and 'B' of the Form." Defendants' Exhibit 12, p. 2. Finally, on March 5, 2015, the appeal was rejected for failing to attach a copy of Plaintiff's Form 128G from Plaintiff's last committee. Defendants' Exhibit 12, p. 3.

During the hearing, Plaintiff initially did not remember whether the screen-outs instructed him to attach a copy of Form 128G. Id. at 50:1-9. Plaintiff was shown a declaration he filed in opposition to the summary judgment motion stating that "On approximately March 13, 2015 I attached the only copy of the 128G to appeal CCI 01500161 as requested on Form CDC Form 695 dated March 5, 2015." Id. at 51:24-52:6. Plaintiff testified that his cellmate at the time, who spoke Spanish and English, had read the screen-out letter to Plaintiff. Id. at 52:10-20. After having his memory refreshed, Plaintiff testified that he submitted the Form 128G but never got an appeal back. Id at 52:24-53:1.

In February of 2015, while in Administrative Segregation, Plaintiff submitted two additional grievances complaining about Defendant Rivera's conduct. Defendants' Exhibit 5 and 6. One of the grievances (Defendants' Exhibit 6) explained that "I have no copies of my papers at this time as it's all unavailable to me in my property being held in 4A property." This grievance did not reference the grievance Plaintiff claimed to have filed the prior year. When asked about this at the hearing, Plaintiff testified "because we considered at that point that that was the reason for the investigation going on, that this was the reason why I was in the hole…. because the reason the investigation was happening was due to the 602." Tr. At 54:15-55:5. These grievances were cancelled for being untimely. Tr. at 60:24-61:2.

Plaintiff appealed the cancellation of these appeals, in which he stated "I submitted my

original 602 within the proper time constraints along with supporting documents (incident report & medical documents) after it was 'lost' in the mail. I ended up in Ad-Seg. I no longer had the proper means to properly pursue my 602 per 15 CCR § 3084.3(b). I still made attempts to pursue my case. When I received my Ad-Seg property. I was given <u>none</u> of my legal material… I submitted what I had per 15 CCR § 3084.6." Defendants' Exhibit 7, p. 2. Plaintiff repeated this in the cancellation of his related appeal. Defendants' Exhibit 8, p. 2. When pressed by defense counsel why Plaintiff did not attach a copy of his original 602 at that time Plaintiff responded, "I want you to understand when I filed this 602, the one we're speaking of now, I was in segregation. And for some reason or another my property had not been given to me for a span of nine months. That is the reason why we don't have a copy here." <u>Tr.</u> at 70:4-71:5. Plaintiff testified he also filed grievances in this time period regarding his lack of legal property while in Administrative Segregation. <u>Id.</u> at 72:16-19.

Plaintiff also submitted copy of a Form 22 dated April 5, 2015 stating "I am writing to request my personal property…. Can you please send all my electronics... along with the rest of my personal property & legal material to 4A (I've been here since July 28, 2014). Thank you for your time." Plaintiff's Exhibit I.

   *ii. J. Wood's Testimony*

Mr. Wood testified that he is employed by the CDCR, and has been since July of 1995. Tr. at 120:22-25. He currently works at CCI Tehachapi. <u>Id.</u> at 120:18-21. He is the Appeals Coordinator, and has been since October of 2014. <u>Id.</u> at 121:6-9. It is his responsibility to process all non-medical grievances from the institution. <u>Id.</u> at 125:5-12.

Mr. Wood testified that it is unusual for an inmate to list the wrong cell number on an appeal (it happens, but not very often). <u>Id.</u> at 124:20-125:1.

Mr. Wood testified that the form for regular grievances has always been green. <u>Id.</u> at 125:21-22.

Mr. Wood testified that all grievances received by the Appeals Office are logged into IATS. <u>Id.</u> at 125:23-126:2.

Mr. Wood testified that inmates have thirty days after an injury or incident to submit a

grievance.  Id. at 126:25-127:2.  An appeal submitted beyond the thirty-day period would generally not be accepted, but there are exceptions (such as if the inmate is out to medical or hospital, or out to court).  Id. at 127:3-8.

Mr. Wood testified that, at the request of the Attorney General's office, he used the IATS system to generate a report of all inmate grievances submitted by Plaintiff while he was housed at CCI Tehachapi.  Id. at 135:7-11.  Looking at the report (which was admitted as Defendants' Exhibit 10), Mr. Wood testified that Plaintiff did not submit any grievances in 2014.  Tr. at 137:1-9.  Plaintiff submitted seven grievances in 2015, two of which were accepted for review.  Id. at 138:2-5.

Mr. Wood testified that, at the request of the Attorney General's Office, he searched the records of Form 22s for the Form 22 submitted by Plaintiff that was dated June 1, 2014, and located it.  Id. at 140:5-12.  The Form 22 was admitted into evidence as Defendants' Exhibit 11, and Mr. Woods read the following from the Form 22: "On or about 5/4 of 14 I submitted a 602 against officers."  Tr. at 140:13-20; 141:11-15.

Mr. Wood testified that in 2015, the Appeals Office did not generally keep copies of grievances that were screened out, but would likely have kept copies of grievances that involved a staff complaint.  Id. at 142:25-143:15.  Additionally, IATS allowed the Appeals Office to type a synopsis of screened-out grievances for its own reference.  Id. at 143:22-144:6.

Mr. Wood testified that Form 128G is a record of the Classification Committee.  Id. at 145:7-10.  Mr. Wood testified that if Plaintiff could not get a copy of Form 128G and showed proof that he attempted to get a copy, then the Appeals Office could print it off.  Id. at 146:2-8.

Mr. Wood testified that there is no record that Plaintiff ever resubmitted the grievance [with log no. CCI-0-15-00161] after it was screened out on March 5, 2015.  Id. at 147:3-7.

Mr. Wood testified that it is uncommon for an inmate to assist another inmate in filing a grievance if the assisting inmate never filed any grievances before.  Id. at 152:13-15.  At the request of the Attorney General's Office, Mr. Wood used the IATS system to generate a record of all inmate grievances submitted by Mr. Mercado.  Id. at 152:16-19.  There were no records of any grievances submitted by Mr. Mercado.  Id. at 152:20-25.

### iii. J. Barba's Testimony

Mr. Barba testified that he is employed as the litigation coordinator at California Substance Abuse Treatment Facility and State Prison at Corcoran. Id. at 157:18-22. Mr. Barba has been working for the CDCR since 1998, and has served as a Correctional Officer, an officer with the Investigator Services Unit, a Correctional Sergeant, a Correctional Counselor 1, and in his current position as a Correctional Counselor 2. Id. at 157:16-17; 158:9-14.

Mr. Barba testified that, in his experience, on any given day, inmates generally know their housing unit and cell number. Id. at 158:15-22.

Mr. Barba testified that, at the request of the Attorney General's Office, he extracted Plaintiff's Bed Assignments Report from the Strategic Offender Management System. Id. at 159:22-25. According to the report (Defendants' Exhibit 13), on January 6, 2014, Plaintiff was housed at CCI Tehachapi, Building C3, 243 low. Id. at 160:1-14. He was moved to cell 241 on February 2, 2014, and vacated that cell on June 23, 2014. Id. at 160:15-21. Plaintiff was never housed in cell 241 before February 2, 2014. Id. at 160:22-24.

### iv. K. Cannon's Testimony

Mr. Cannon testified that he is employed as a search and escort officer at CCI Tehachapi. Id. at 162:25-163:7. Prior to becoming a search and escort officer in 2015, Mr. Cannon spent ten years as a law librarian in Ad Seg and the SHU. Id. at 163:12-16.

Mr. Cannon testified that inmates were generally charged ten cents a copy. Id. at 165:1-2. However, if an inmate did not have any money in their trust account, they would still be able to make legal copies. Id. at 165:3-8. Grievances only count as legal copies if the grievance has been processed all the way through the third level of review. Id. at 165:9-16.

### v. Peter Mercado's Testimony

Mr. Mercado testified about how he helped Plaintiff put in a grievance in December of 2013. Id. at 102:2-4. He was in the same prison with Plaintiff and heard through other inmates that something had happened to Plaintiff. Id. at 102:5-10. Mr. Mercado explained "he [Plaintiff] approached me asking me, since he couldn't like really fill out the 602 form, if I could help him and I said, 'Yeah, no problem.' And so I helped him fill it out and then he put it

in." Id. at 102:10-14.  He spoke Spanish enough to understand Mr. Molina because he has a grandmother who speaks Spanish.  Id. at 102:17-20.  Mr. Mercado described how Plaintiff told him what happened and Mr. Mercado "just filled out like a basic little complaint."  Id. at 102:21-24; 103:9-14.

Mr. Mercado testified that he "asked [Plaintiff] later on down the line a couple of months later… 'What happened in the process 602,' and you know, and he was like 'Oh, I put it in, but I'm still waiting.  I haven't heard nothing.'  Then he actually asked one of the sergeants over there in Tehachapi, that he was asking about the 602, what's going… on with it, and they told him to stop crying about it, you know."  Id. at 104:4-15.  Mr. Mercado testified that he was "In the hole at the 4A Yard," when he witnessed the discussion between Mr. Molina and the Sergeant.  Id. at 107:10-19.

When asked if he had submitted a grievance for himself in the past, he testified "On my personal grounds, yeah, but it never go through because the cops always take them away here."  Id. at 107:20-23.  He stated that he had submitted grievances but "It's hard to get a response over there," referring to CCI Tehachapi.  Id. at 107:24-108:5.  He later explained that "Usually, over there in Tehachapi you put in a 602 and they never make it to where they're supposed to go…. And usually, there's retaliation when you do it…. They come and just harass you, just tear your stuff up, try to manhandle you."  Id. at 109:10-22.

*vi.  Michael Hernandez's Testimony*

Mr. Hernandez testified that he used to live in the cell next to Mr. Molina.  Id. at 112:12-17.  He "assisted Mr. Molina in writing out and filing the 602 because he's not really good at, at English.  So I, I assisted him at, at filing medical 602 for the negligence and I also assisted him to get some medical attention during, you know, at the time after being pepper sprayed in the eye."  Id. at 112:2-9.  Mr. Hernandez testified that this happened in January of 2014.  Id. at 112:10-11.  He recalls the subject of the 602 being that Plaintiff "wasn't getting the proper medical attention needed and he was being denied medical attention on his eye."  Id. at 113:9-13.  Mr. Hernandez testified that he saw Plaintiff submit the 602 to an officer, and believes that officer was named Stewart.  Id. at 113:14-20.  Mr. Hernandez believes that it was

a pink grievance for medical. Id. at 115:14-24.

Defense counsel asked Mr. Hernandez "And you're sure that this happened in January 2014," and Mr. Hernandez replied "The 602 is, yes." Id. at 116:20-24.

## VI. **Analysis of Evidence**

It is undisputed that the CDCR has a policy in place for administrative grievances. (ECF No. 48, pgs. 2-3). It is also undisputed that Plaintiff did not take a grievance covering the allegations in the complaint through all stages of this administrative process. Thus, the question is whether those procedures were "available" to him, especially in light of Ninth Circuit law that "[w]hen prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." Andres, 867 F.3d at 1079.

The Court finds that the evidence overwhelmingly supports that Plaintiff filed grievances regarding the allegations in the complaint.

As for the pepper spray incident, Plaintiff testified in great detail how he prepared a 602 regarding the pepper spray incident with the help of Mr. Mercado. The Court observed Plaintiff's demeanor on the stand and found him to be credible when he described these events. Plaintiff admitted into evidence a copy of the grievance that he submitted, which is dated January 6, 2014, and describes the pepper spray incident. Defendants' Exhibit 1, dated 1-6-14 (describing how "C/o Rivera and Sgt John Doe… maliciously, willfully, knowingly injuring my right eye with the spray."). Both Mr. Mercado and Mr. Hernandez independently testified that they assisted Plaintiff with preparing grievances related to the pepper spray incident in January of 2014, and corroborated the version of events Plaintiff gave regarding Mr. Mercado's assistance writing the grievance due to Plaintiff's lack of English proficiency, and Mr. Hernandez's encouragement to submit the grievance. Plaintiff and the prison both have copies of the Form 22 he filed in June 2014 asking about a grievance he had already filed. Defendants' Exhibit 11 and Plaintiff's Exhibit D ("I submitted a 602 Appeal (citizen complaint) against C/o Rivera. However until the above date I have not received a receipt of the notice of Appeal."). According to the transcript of the July 2014 prison interview, Plaintiff

said he had filed a grievance about the pepper spray incident. Defendants' Exhibit 19 at 5:18-20 ("he filed a 602 about his eye, and the 602 got lost and nobody knows where it's at"). He also mentioned that he had already filed a 602 when he filed another 602 regarding the same events at a later time while he was in Administrative Segregation. Defendants' Exhibit 8, p. 2 ("I submitted my original 602 within proper time constraints along with supporting documents… after it was 'lost' in the mail.").

It is also undisputed that Plaintiff never received any response from the prison to the grievance he filed in January of 2014 regarding the pepper spray incident.

During the hearing, Defendants tried to cast doubt on Plaintiff's version of events by pointing to various inconsistencies. For instance, Plaintiff's grievance was a "regular" grievance, but Mr. Hernandez testified he had assisted Plaintiff with a medical grievance. Plaintiff listed his cell number as C3-241, but it appears that his cell number was CS- 243 at that time. Defendants' Exhibit 13. Most importantly, the Form 22 he submitted to the prison asking about the grievance says that he had submitted it on 5-4-14, rather than 1-4-14, and indeed that Plaintiff wrote in 1-4-14 himself on his copy at a later time.

The Court finds that the preponderance of the evidence supports that Plaintiff submitted a grievance covering the pepper spray incident within thirty days of the incident. This evidence includes the date on the copy of the grievance, Plaintiff's testimony explaining how he completed and filed the grievance shortly after the incident, and Mr. Hernandez and Mr. Mercado's corroborating testimony regarding the timing of Plaintiff's grievance. While the Court notes the discrepancies, it appears more likely that there was in fact an error on the Form 22 than that Plaintiff waited five months to submit the Form grievance. Moreover, Plaintiff required assistance of different bilingual inmates to prepare every submission because Plaintiff himself does not read or write in English. It is seems quite possible that the accurate date was indeed lost in translation.

But regardless of the date, the fact remains that the prison never answered the grievance that Plaintiff did file. On the contrary, there was testimony from Plaintiff, corroborated by Mr. Mercado, that prison officials dismissed his questions about the 602 and told him that he "was

lucky that [his] other eye was still fine and that [he] should quit [his] crying." When a judge eventually wrote the prison about the same event, the prison interviewed him and then placed him in Administrative Segregation for over a year precisely because he had made a staff complaint. Plaintiff's Exhibit E ("you informed staff during a videotaped interview that you have self proclaimed safety concerns with staff… Based on this you are deemed a threat to the safety of others and the security of the institution."). Not to mention the testimony of Mr. Mercado that the prison regularly failed to process staff complaints at the time, and chose instead to retaliate against the complaining inmate. The evidence supports the finding that CCI Tehachapi failed to properly process Plaintiff's grievance, and thus the administrative remedy was "unavailable" to Plaintiff.

Although there was less testimony on the subject of his detention in Administrative Segregation, the evidence also firmly establishes that Plaintiff filed a grievance challenging his placement in Administrative Segregation. Plaintiff testified that he filed three grievances on this issue. The prison has three screen-out letters from this time period that request a document related to Plaintiff's placement in Administrative Segregation.

CCI Tehachapi did respond to the Administrative Segregation grievances. CCI Tehachapi rejected them because they did not include a copy of the Form 128G. Defendants' Exhibit 12 ("Attach a copy of the CDCR 128 from your last committee," "You still need to attach a copy of your CDCR 128G from your last committee."). Notably, the Appeals Office has access to such a form and can easily print it themselves. Tr. at 146:2-10 ("if he couldn't get a copy of the 128G and showed proof that he attempted to, then we can print it off."). Under the circumstances, the requirement to submit Form 128G did not serve a legitimate penological purpose, but instead worked solely to thwart Plaintiff from exhausting his administrative remedies.

Additionally, the evidence indicates that Plaintiff could not, at least initially, satisfy this requirement because he was in Administrative Segregation and lacked his legal property. Plaintiff testified that he did not have his legal property, and submitted a complaint to the prison requesting such property. Plaintiff's Exhibit I, dated 4-5-15 (requesting legal material).

He also testified that he eventually submitted Form 128G[5] to the appeals office, but still never received a response. Id at 52:24-53:5. Based on this evidence, Plaintiff has met his burden by showing, by the preponderance of the evidence, that the administrative grievance procedure was not available to him at the time he was complaining about his placement in Administrative Segregation.

Moreover, the Court observed Plaintiff's demeanor on the stand and found him to be credible when he testified that he eventually submitted Form 128G to the Appeals Office, along with his grievance related to his placement in Administrative Segregation, on March 13, 2015. Id. at 51:24-53:1. However, Plaintiff never got a response. Id. at 52:24-53:1. The evidence thus establishes that Plaintiff submitted a grievance on this issue, it was screened out for a reason unrelated to penological purposes, Plaintiff could not meet that requirement at the time he submitted his grievances, Plaintiff requested his legal materials, Plaintiff eventually did comply with the prison's requirement, and the prison then failed to respond to the grievance even with the prison's requested paperwork. Accordingly, pursuant to Andres, Plaintiff should be deemed to have exhausted his available administrative remedies.

Although these conclusions do not depend on any further findings, it is worth noting that all administrative grievance forms and responses from the prison were in English. Plaintiff does not read or speak English. He did not always have access to an inmate translator. Moreover, while Plaintiff testified that such actions did not deter him, Plaintiff and Mr. Mercado both provided testimony regarding prison guards making threats and retaliating against those who submitted staff complaints. Ross, 136 S.Ct. at 1860 (administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.").

Thus, based on all evidence presented, the Court recommends that Plaintiff be deemed to have exhausted his available administrative remedies as to all claims.

\\\

---

[5] Plaintiff was not sure whether what he submitted was a copy, or the original. Tr. at 53:2-5.

## VII.	PLAINTIFF'S MOTION FOR EXPERT WITNESS

As to Plaintiff's motion for expert witness, the Court will recommend denying it without prejudice.  As analyzed above, the Court recommends finding that Plaintiff exhausted his available administrative remedies as to all claims.  Accordingly, at this time there is no need to have an expert to attempt to determine whether the video footage contained in the DVD submitted by Defendants was improperly edited.  Therefore, Plaintiff's motion for expert witness should be denied without prejudice as moot.

## VII.	CONCLUSION AND RECOMMENDATIONS

For foregoing reasons, the Court finds that there is a genuine dispute of material fact regarding whether Plaintiff exhausted his available administrative remedies, and recommends that Defendants' motion for summary judgment be denied and that Plaintiff deemed to have exhausted his available administrative remedies as to all claims.

Accordingly, based on the foregoing, IT IS HEREBY RECOMMENDED that**:**

1.	Defendants' motion for summary judgment (ECF No. 37) be DENIED;

2.	That Plaintiff be deemed to have exhausted his available administrative remedies as to all claims; and

3.	Plaintiff's motion for expert witness (ECF No. 71) be DENIED without prejudice.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within fourteen (14) days** after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.

\\\
\\\

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**March 2, 2018**__                    ___/s/ Erica P. Grosjean___

UNITED STATES MAGISTRATE JUDGE